IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| SAM FOREMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | No. 5:15-CV-140 (CAR) |
| | : | |
| NORFOLK SOUTHERN | : | |
| CORPORATION, and | : | |
| NORFOLK SOUTHERN | : | |
| RAILWAY COMPANY, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Sam Foreman brings this action alleging Defendants Norfolk Southern Corporation and Norfolk Southern Railway Company (collectively "Norfolk Southern" or "Defendants") discriminated against him due to his disability, in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq* (the "ADA"). Specifically, after having a stroke and returning to work, Plaintiff contends Defendants regarded him as having a disability and demoted him from a Mechanic to a Helper position. Currently before the Court is Defendants' Motion for Summary Judgment. Having considered the parties' arguments, the record, and applicable law, Defendants' Motion for Summary Judgment [Doc. 22] is **GRANTED**.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1]  A genuine issue of material fact only exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[2]  Thus, summary judgment must be granted if there is insufficient evidence for a reasonable jury to return a verdict for the nonmoving party or, in other words, if reasonable minds could not differ as to the verdict.[3]  When ruling on a motion for summary judgment, the Court must view the facts in the light most favorable to the party opposing the motion.[4]

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitle it to a judgment as a matter of law.[5]  If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings

---

[1] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[2] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[3] *See id.* at 249-52.

[4] *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).

[5] *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).

and present specific evidence showing that there is a genuine issue of material fact.[6]  This evidence must consist of more than mere conclusory allegations or legal conclusions.[7]

## BACKGROUND

For the purposes of this Motion, the material facts in the light most favorable to Plaintiff, the nonmovant, are as follows:

Norfolk Southern

Norfolk Southern is a Class 1 railroad company engaged in freight transportation with eleven operating divisions in the United States.  Norfolk Southern has a Maintenance of Way Department divided into two sub-departments: (1) the AFRE Bridges and Building Department and (2) the Track Department.  The sub-departments are further broken down into territorial divisions.  The Georgia territories include Savannah, Atlanta, and GS&F.  Each territory has multiple work gangs assigned to it; each work gang has between two and five employees, and each gang works 40-hour work weeks.  Maintenance of Way employees may also be assigned to work in different locations within their territory for a work week and required to drive the gang truck to and from the worksite.[8]

The Brotherhood of Maintenance of Way Employees Union (the "Union") represents Norfolk Southern's Maintenance of Way employees and establishes the rates

---

[6] *See* Fed. R. Civ. P. 56(e); *see also Celotex Corp.*, 477 U.S. at 324-26.
[7] *See Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991).
[8] Defendants's Stmt. of Mat. Facts, [Doc. 30] at paras. 1,19, & 27-28.

of pay, rules, working conditions, and rights and obligations of both parties through a collective bargain agreement.  This bargaining agreement authorizes Norfolk Southern to require a certain number of positions to carry a commercial driver's license ("CDL") based on the number of Department of Transportation ("DOT") Vehicles assigned to a gang.  For instance, for every one commercial motor vehicle assigned to a five-member gang, Norfolk Southern may require three positions to carry a CDL.  This is to ensure that a qualified driver is always available on a gang.[9]

Because Norfolk Southern is registered with the DOT as an interstate carrier, it is subject to periodic DOT compliance inspections, including driver fitness requirements.[10] Norfolk Southern must also comply with the Federal Motor Carrier Safety Administration's ("FMCSA") safety standards for commercial motor vehicle ("CMV")[11] operators.[12]  The FMCSA sets forth baseline requirements to ensure all CMV operators have the necessary skills, knowledge, and physical condition to allow them to operate a CMV safely in interstate commerce.[13]  As such, the FMCSA establishes the requirements necessary to obtain DOT medical certification and a CDL.[14]  A CDL is federally required to operate a CMV, and the FMCSA regulations prohibit an employer from allowing or

---

[9] *Id*. at paras. 20-23.

[10] *Id*. at para. 2.

[11] A CMV is defined as a vehicle driven on highways in interstate commerce with a gross vehicle weight of at least 10,0001 pounds. 41 U.S.C. § 31132(1); 49 C.F.R. § 390.5.

[12] Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 3.

[13] 49 C.F.R. §§ 383.1 & 383.37.

[14] *See* 49 C.F.R. § 383.37.

authorizing a person to operation a CMV without a current CDL.[15]

<u>Plaintiff's Employment</u>

In 1990, Norfolk Southern hired Plaintiff as an Apprentice on a gang in the Bridges and Building Maintenance of Way Department ("B&B") in Millen, Georgia.  In general, the B&B gangs are in charge of repairing the railroad track bridges in their territories.  These gangs are often required to drive a CMV, operate heavy equipment, work at elevated heights, and travel out of town to job site.[16]  As an Apprentice, Plaintiff was not required to hold a CDL or drive the CMV.[17]  However, a few years later, Plaintiff bid into a Mechanic position, which required him to obtain a CDL.[18]

Between 1990 and 2008, Plaintiff held several different positions in different territories in Georgia.  In 2009, Plaintiff bid into the B&B Mechanic position on the G9B gang in Macon, Georgia.  Plaintiff held this position on the G9B gang until September of 2013.[19]  The following events led to Plaintiff's cause of action against Norfolk Southern.

<u>Plaintiff's Disability Claim</u>

In May 2013, Norfolk Southern sent Plaintiff a letter advising him that his Medical Examiner's Certificate ("DOT medical card"), certifying he was medically qualified to

---

[15] *See* 49 C.F.R. §§ 383.1 and 383.37.

[16] Pl. Sam Foreman's Dep., [Doc. 24] at  p. 25-28.

[17] *Id*. at p. 25.

[18] *Id*. at p. 35.

[19] *Id*. at p. 23, 39-42.

operate a CMV, was about to expire.[20]  To renew this card, Plaintiff had to pass a physical

examination and have the doctor certify he was clear to hold a CDL.  Initially, Plaintiff

went to a Norfolk-Southern-approved facility.  However, after this facility twice denied

his medical card due to high blood pressure, Plaintiff went to his personal physician, Dr.

Riley.[21]

On July 12, 2013, Dr. Riley issued Plaintiff a temporary DOT medical card.[22]  After

he presented this card to his Project Manager, Kevin Jones, Plaintiff was advised that

Norfolk Southern would not accept a medical card signed by a non-approved facility.[23]

Accordingly, Plaintiff scheduled an appointment with an approved facility for the week

of July 22, 2013, to have his blood pressure rechecked.[24]  However, Plaintiff was unable to

make this appointment.

Over the weekend, on July 21, 2013, Plaintiff suffered a cerebellar vascular stroke

and was admitted to the hospital for four days.  Plaintiff was out on medical leave for

approximately seven weeks.[25]  He had no apparent residual effects or continuing

problems from the stroke and was ultimately cleared to return to work by August 27,

---

[20] Dr. Thaddeus Riley Dep., [Doc. 28] at p. 173.

[21] Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 37-39; Dr. Riley Dep., [Doc. 28] at p. 136; 172. One of the FMCSA medical qualification standards to hold a CDL concerns blood pressure.  Def.'s Stmt. of Mat. Facts, [Doc. 30] at para. 36-37.

[22] Dr. Riley Dep., [Doc. 28] at p. 172.

[23] Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 40.

[24] *Id*. at para. 41.

[25] *Id*. at para. 55.

2013.[26]

During his medical absence, Norfolk Southern contacted Plaintiff requesting medical records concerning his stroke and a release from his physician, as well as other information.[27]   On August 16, 2013, Plaintiff faxed his medical records from both the hospital's doctor, Dr. Patel, and his personal physician, Dr. Riley, to Norfolk Southern's Medical Department.[28]   Norfolk Southern's Occupational Health Nurse, Anita Euell, reviewed these records and later reviewed them with Dr. Prible, the Medical Director, and Dr. Lina, the Associate Medical Director.[29]   After confirming Plaintiff had a stroke, Euell determined his stroke prohibited him from holding a CDL for at least one year under the FMCSA guidelines.[30]   Thus, on August 19, 2013, Euell contacted the B&B Department supervisor, Plaintiff, and Dr. Patel's office.[31]

Euell's e-mail to the B&B Department asked whether Plaintiff could be reasonably accommodated due to his work restriction, and the Department confirmed it could place him in a position that did not require a CDL.[32]   Euell then contacted Plaintiff requesting a medical release form from Dr. Patel.  Euell also sent Dr. Patel's office a Job Demand

---

[26] *Id.* at paras. 42, 45, & 58; Anita Euell Aff., Ex. C, [Doc. 30-2] at p. 16.
[27] Pl.'s Dep., Ex. 15, [Doc. 24-10] at p. 11.
[28] Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 47-78.
[29] Euell Aff., [Doc. 30-2] at para. 6; Anita Euell Dep., [Doc. 29] at p. 16-17.
[30] Euell Dep., [Doc. 29] at p. 20; Euell Aff., Ex. A, [Doc. 30-2] at p. 7.
[31] Defs.'s Stmt. of Mat. Facts, [Doc. 30], at paras. 50-52; Euell's Dep., [Doc. 29] at p. 18, 28, 29.
[32] Euell's Dep., [Doc. 29] at p. 19-20.

Form to help Dr. Patel determine whether Plaintiff could be cleared for work.[33]   On August 28, 2013, Dr. Patel's office faxed Plaintiff's medical release form stating Plaintiff could return to work without restriction or "as per his work guideline" by August 27, 2013, with the additional comment, "fall precaution needs to follow."[34]   However, because Euell was unclear as to what "fall precaution" meant, she requested that Dr. Patel further clarify the medical release before clearing Plaintiff to return to work.[35]

On September 3, 2013, the Medical Department received a letter from Dr. Patel stating Plaintiff could return to work by August 27, 2013, and was "able to work without restrictions or as per his work guidelines."[36]   Euell then e-mailed the Project Manager, Kevin Jones, informing him the Medical Department had cleared Plaintiff to return to work.  Around September 9, 2013, Plaintiff returned to work in the Apprentice position on the G9B gang.[37]  At this time, the B&B G9B gang included a Foreman, two Mechanics, a Helper, and an Apprentice. [38]

Approximately two weeks later, Plaintiff's coworkers informed Jones that Plaintiff

---

[33] Euell Dep., [Doc. 29] at p. 28.

[34] Euell Aff., Ex. C, [Doc. 30-2] at p. 16.

[35] Euell Aff., [Doc. 30-2] at para. 20.

[36] Dr. Kashyap Patel Dep., [Doc. 26] at p. 23, 31; Dr. Patel Dep., Ex. 29, [Doc. 26-3] at p. 10.

[37] Pl.'s Dep., [Doc. 24] at p. 14; Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 45.  It seems that Plaintiff claims he returned to work September 13th. Pl.'s Disputed Stmt. of Mat. Facts, [Doc. 35-2] at para. 58.

[38] Kevin Jones Dec., [Doc. 30-3] at para. 2. The Court notes Plaintiff disputes which positions on the G9B gang were required to hold a CDL, arguing there was no difference in the positions as they all performed the same job duties.  However, Plaintiff does not point to any evidence showing the Helper and Apprentice positions on G9B gang were required to hold CDLs.  Instead, Plaintiff only points to Helper positions in different gangs that requires a CDL; while Plaintiff's Project Manager, Kevin Jones, clearly states a CDL was only required for the Foreman and Mechanic positions.  Jones Dec., [Doc. 30-3] at para. 5.

(1) lost "focus at times and could not remember information from job briefings"; (2) "would forget what he was supposed to do once the gang got to a job site"; (3) "had not recognized a work location, and in fact, had argued with a coworker about their location until he spent time looking around the area";  and (4) "had put tools up in his truck, walked to another truck, and asked whether they wanted to put the tools up on the second truck."[39]   Due to this troubling level of confusion, Jones instructed the gang Foreman, James Johnson, not to allow Plaintiff to work at heights.[40]  Plaintiff disputes that he ever displayed any symptoms of confusion on the job.

On September 23, 2013, Jones informed Euell about these incidents.   After consulting with Dr. Linda, Euell directed Jones to remove Plaintiff from service, and she placed Plaintiff on a medical hold pending a fitness for duty determination.[41]   After passing neuropsychological tests, Plaintiff was cleared to return to work.  On January 2, 2014, because Plaintiff no longer carried a valid DOT medical certificate or CDL, Norfolk Southern placed him in the Helper position rather than the Mechanic position on gang G9B.[42]

---

[39] Jones Dec., [Doc. 30-3] at para. 3. Plaintiff argues this information is impermissible hearsay and should be excluded.  However, Defendant offers these statements to explain why Plaintiff was removed from service, not to show Plaintiff actually exhibited this behavior.  Thus, the statements are not being offered to prove the truth of the matter asserted and are not hearsay.  *See* Fed.R.Civ.P. 803(c); *see also Verna v. Public Health Trust of Miami Dade Cnty.*, 539 F.Supp.2d 1340, 1350 (N.D. Fla. 2008).

[40] Jones Dec., [Doc. 30-3] at para. 3.

[41] Euell Dep., [Doc. 29] at p. 31-32.

[42] Pl. Dep., [Doc. 24] at p. 117; Defs.'s Stmt. of Mat. Facts, [Doc. 30] at para. 67.

## DISCUSSION

Plaintiff brings this ADA action against Norfolk Southern for discriminating against him due to his disability when it demoted him from the B&B Mechanic position to the Helper position.  Norfolk Southern seeks summary judgment, arguing Plaintiff was not qualified for the B&B Mechanic position and none of its actions violated the ADA.  The Court agrees.

The ADA prohibits employers from discriminating against qualified employees based on their disabilities.[43]   Here, Plaintiff seeks to prove these claims through circumstantial evidence, and thus the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*[44] guides the Court's analysis.[45]   Under this framework, a plaintiff must first establish a prima facie case by establishing "facts adequate to permit an inference of discrimination."[46]   If the plaintiff establishes his *prima facie* case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.[47]   If the employer meets this "exceedingly light" burden, then the inference of discrimination is erased, and the burden shifts back to the plaintiff, who

---

[43] 42 U.S.C. § 12112(a).

[44] 411 U.S. 792 (1973).

[45] *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

[46] *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

[47] *Cleveland*, 369 F.3d at 1193.

must show that the employer's proffered reasons were merely pretext for discrimination.[48] Importantly, the ultimate burden of persuasion remains on the plaintiff all times.[49]

The Court notes that the *McDonnell Douglas* method "was never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination."[50]  Ultimately, a plaintiff will overcome summary judgment if he creates a genuine issue of material fact that permits a "reasonable inference" the employer acted with discriminatory intent.[51]

To establish a *prima facie* case of discrimination under the ADA, Plaintiff must show: (1) he has a disability within the meaning of the statute; (2) he was a "qualified individual" for the position; and (3) he suffered an adverse employment action because of his disability.[52]  Because Norfolk Southern ultimately concedes Plaintiff meets the test for a perceived disability, the first element of his *prima facie* case is satisfied.[53]  Thus, the Court moves to the second element of Plaintiff's *prima facie* case.

---

[48] *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994).

[49] *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

[50] *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983) (internal quotation omitted).

[51] *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

[52] *Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *see also Wascura v. City of S. Miami*, 257 F.3d 1238, 1242-43 (11th Cir. 2001) ("In the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases.").

[53] Def.'s Mtn. for Summary Judgment, [Doc. 31] at p. 4 ("For purposes of this motion, [Defendant] does not dispute that [Plaintiff] meets the test for a perceived [ ] disability."). *See* 42 U.S.C. § 12102(3)(A).

## I. Qualified Individual

A qualified individual is an employee "with a disability who, with or without reasonable accommodation, can perform the essential function of the employment position that such individual holds or desires."[54]   First, Plaintiff maintains he has always been qualified for the B&B Mechanic position because he holds a DOT medical certificate from his personal doctor.   Second, Plaintiff argues driving a CMV is not an essential function of the job, and thus, he did not need a valid medical certificate and CDL.   Finally, although Plaintiff did not specifically argue it, the Court will address whether Plaintiff could have performed the essential functions of the job with a reasonable accommodation.[55]   The Court will address each argument in turn.

### A.  Valid Medical Certificate and CDL

Plaintiff maintains he is qualified for the B&B Mechanic position because he has a valid medical certificate issued by a medical doctor listed on the National Registry of Medical Examiners pursuant to 49 C.F.R. § 383.37 and thus holds a valid CDL.[56]   Further, Plaintiff argues neither federal law nor the Union's bargaining agreement requires that

---

[54] *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000) (internal quotation marks omitted) (quoting 42 U.S.C. § 12111(8)).

[55] Plaintiff does not specifically make this reasonable accommodation argument.   However, the Court will consider it, as Plaintiff's argument that a B&B Mechanic did not have to drive a CMV goes to both the essential function prong and the reasonable accommodation prong.

[56] *See* 49 C.F.R. 390.101 ("The rules in this subpart establish the minimum qualifications for FMCSA certification of a medical examiner and for listing the examiner on FMCSA's National Registry of Certified Medical Examiners. The National Registry of Certified Medical Examiners Program is designed to improve highway safety and operator health by requiring that medical examiners be trained and certified to determine effectively whether an operator meets FMCSA physical qualification standards under part 391 of this chapter.").

Plaintiff see a doctor associated with Norfolk Southern, and it should be against public policy to require him to see Norfolk Southern's doctor.  The Court disagrees.

The Federal Motor Carrier Safety Administration's Regulations ("FMCSR") only establish "the minimum qualifications for persons who drive commercial motor vehicles,"[57] and nothing in the regulations "shall be construed to prohibit an employer from requiring and enforcing more stringent requirements relating to safety of operation and employee safety and health."[58]   Thus, it is clear nothing in the FMCSR prevents Norfolk Southern from requiring its employees to get medical certificates from approved medical facilities and refusing to accept certificates from non-approved doctors.

Here, Norfolk Southern's Medical Department requires all employees to obtain medical certificates from approved medical facilities.  Plaintiff's project manager, Kevin Jones, specifically told him Norfolk Southern would not accept a medical certificate from a non-approved doctor, and gave him an opportunity to go back to an approved medical facility.  However, as of 2013, Plaintiff had not provided Norfolk Southern with a DOT medical certificate from an approved medical facility and, thus, did not have a valid CDL. Accordingly, Plaintiff's argument that he has always been qualified for the B&B Mechanic position must fail.[59]

---

[57] 49 C.F.R. § 391.1(a).

[58] 49 C.F.R. § 390.3T(d).

[59] Plaintiff's remaining arguments are also unavailing.  The FMCSA Medical Examiner's Handbook recommends that an individual who had a stroke should not be issued a medical card for at least one year

B.  Essential Function

Next, Norfolk Southern contends driving a CMV is an essential function of the B&B Mechanic position, and Plaintiff could not perform this function because he did not have a valid CDL. Plaintiff disputes this, as he only drove a CMV twice a week, he was not the assigned driver on the G9B gang, and there were seven to nine other employees that were available to drive the CMV.  Thus, Plaintiff argues a valid CDL was not necessary to perform an essential function of the position.

The "essential functions" of a job are defined as "the fundamental job duties of the employment position the individual with a disability holds or desires, and does not include the marginal functions of the position."[60]  "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors."[61]  In determining this, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."[62]  "The ADA regulations provide that other factors to consider are: (1) the amount of time spent on the job performing the function, (2) the

---

following the stroke, and the Occupational Health Nurse consulted the FMCSA when she determined Plaintiff could not drive a CMV for at least one year. *See* Euell Aff., Ex. A, [Doc. 30-2] at p. 9.

[60] *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005) (quoting 29 C.F.R. § 1630.2(n)(1)).

[61] *Id.* (internal quotation marks omitted) (quoting *Davis*, 205 F.3d at 1305).

[62] 42 U.S.C. § 12111(8).

consequences of not requiring the incumbent to perform the function, (3) the terms of a collective bargaining agreement, (4) the work experience of past incumbents in the job, and (5) the current work experience of incumbents in similar jobs."[63]   Further, a job "function may be essential because of the limited number of employees available among who the performance of that job function can be distributed."[64]   As applied here, these factors support a finding that driving a CMV was an essential function of the B&B Mechanic position.

First, both Plaintiff and Norfolk Southern's descriptions of Plaintiff's job show that driving a CMV is an essential function of the position.   The job description in the Job Demand Form sent to Plaintiff's doctor on August 19, 2010, states in the additional comments section that "driving large trucks" was a part of Plaintiff's job.[65]   The B&B Mechanic posting for the G9B gang specifically required a CDL, which also implies driving a CMV was a required part of the position.   More importantly, in Plaintiff's own written description of his job duties, he lists "drives gang, dump, and or yard trucks" as the first job duty under the B&B Mechanic position.[66]

In addition, the factors in the ADA regulations also support that driving a CMV is an essential function of the position.   Up until 2012, Plaintiff frequently drove the CMV as

---

[63] *Davis*, 205 F.3d at 1305 (citing 29 C.F.R. § 1630.2(n)(3)).

[64] 29 C.F.R. § 1630.2(n)(2)(ii).

[65] Dr. Patel's Dep., Ex. 28, [Doc. 26-3] at p. 9.

[66] Pl. Dep., Exhibits [Doc. 25-1] at pg. 4.

a B&B Mechanic, and between 2012 and 2013, Plaintiff drove approximately two to three times a week for two to three hours at time.[67]   Further, the terms of the bargaining agreement permit that for every CMV assigned to a five-member work gang, Norfolk Southern may require three of those positions to carry a valid CDL to ensure there is always a qualified driver on the gang.   On the G9B gang, the Foreman and two B&B Mechanics are all required to hold a valid CDL.   When Plaintiff applied to the position in 2009 it required a CDL, and when the position was posted after Plaintiff's stroke it require a CDL.   Plaintiff has always renewed his CDL, and the individual who replaced Plaintiff in the B&B Mechanic position has a CDL.   Moreover, even though Plaintiff argues he was not the lead driver and there were other employees who could have driven the CMV, he also admits multiple employees hold a CDL to ensure if someone was absent or on vacation there would always be a qualified driver available.[68]

Therefore, the Court finds there is no genuine dispute of material fact as to whether having a CDL and driving a CMV are essential functions of the B&B Mechanic position.[69]

---

[67] Pl.'s Dep., [Doc. 24] at p. 100-101. *Cf. Samson v. Federal Exp. Corp.*, 746 F.3d 1196, 1202 (11th Cir. 2014) (where the plaintiff only test-drove the vehicles three times in three years, the Eleventh Circuit characterized this amount of time as "miniscule" and determined this factor weighed in favor of finding that test-driving was not an essential function of the position).

[68] Pl.'s Dep., [Doc. 24] at p. 109.

[69] Because a CDL is required to drive a CMV, possessing a CDL is also an essential function of the B&B Mechanic position. *See* 49 C.F.R. § 383.37; *Stevens v. South. Nuclear Operating Company, Inc.*, —FSupp3d—, No. CV 114-240, 2016 WL 4535662, at *4 (S.D. Ga Aug. 30, 2016) ("And a job requirement that is mandated by law will often be an essential function of the job." (citing *Albertson's v. Kirkingburg*, 527 U.S. 555, 570–73 (1999)); *see also Hawkins v. Schwan's Home Serv. Inc.*, 778 F.3d 877, 895 (10th Cir. 2015) ( "Thus, as a matter of law, if an essential function of a position is the ability to operate a commercial vehicle, then being DOT-certified is an automatic, binding, and utterly unavoidable requirement."); *Wetherbee v. S. Nuclear Operating Co.*, No. 1:08–

Because Plaintiff did not hold a valid CDL when he was reinstated in September 2013 or January 2014, he could not perform an essential function of his position.

### C. Reasonable Accommodation

To now maintain his ADA claim, Plaintiff must show he can perform the essential functions with a reasonable accommodation.  A reasonable accommodation for a given employer is a highly fact-specific inquiry that will vary depending on the circumstances and necessities of each employment situation.[70]  The burden is on the plaintiff to identify a reasonable accommodation the employer should have made.[71]  And, although reasonable accommodations may include job restructuring, "an employer is not required to relocate job duties to change the functions of a job."[72]

In this case, the only accommodation available is to allow Plaintiff to hold the B&B Mechanic position without having a valid CDL or driving a CMV.  This proposed accommodation is unreasonable as a matter of law because it would force Defendant to eliminate an essential function of the B&B Mechanic position.[73]  Accordingly, Plaintiff is

---

cv–2138–CAM, 2010 WL 11428172, at *6 (N.D. Ga. Mar. 17, 2010) ("A job qualification that is mandated by law constitutes an essential job function.").

[70] *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1527 (11th Cir. 1997).

[71] *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998).

[72] *Webb v. Donley*, 347 F. App'x 443, 446 (11th Cir. 2009) (per curiam); *see also Medearis v. CVS Pharmacy, Inc.*, 646 F.App'x 891, 895 (11th Cir. 2016) (per curiam); *Holbrook*, 112 F.3d at 1527-28 (quoting 29 C.F.R. Pt. 1630, App'x at 344).

[73] *See, e.g., Davis v. Great South. Wood Preserving, Inc.*, No. 05-0641-WS-C, 2007 WL 294127, at *7 (S.D. Ala. Jan. 29, 2007) (finding the requested accommodation was not reasonable where the plaintiff could not satisfy the DOT regulations and thus could not perform the essential function of the job); *Allen v. Ga. Power Co.*, 980 F.Supp. 470, 478 (N.D. Ga. 1997) ("This proposed accommodation is unreasonable as a matter of law because it would force Defendant to eliminate essential functions of Plaintiff's position under the guise of reasonably

not a qualified individual under the ADA, as he cannot perform the essential functions of the B&B Mechanic position with or without a reasonable accommodation.[74]

## II. Business-Necessity Defense

Even if Plaintiff could prove he is a qualified individual, the ADA affords Norfolk Southern a complete defense to Plaintiff's claims. The ADA prohibits an employer from applying a qualification standard that screens out or tends to screen out disabled persons, "unless the standard is shown to be job-related for the position in question and is consistent with business necessity."[75] Additionally, an employer may not require a medical examination or make inquiries of an employee as to whether such employee has a disability, "unless such examination or inquiry is shown to be job-related and consistent with business necessity."[76]

In this case, Norfolk Southern's rule requiring employees to obtain a CDL from an approved medical facility, and Norfolk Southern's decision to remove Plaintiff from service and place him on medical hold until his fitness for duty could be evaluated are

---

accommodating Plaintiff's disability."); *Davis v. Great South. Wood Preserving, Inc.*, 2007 WL 294127 (S.D. Ala. 2007).

[74] The Court notes that Defendants have already provided a reasonable accommodation by placing Plaintiff in the Helper position on the G9B Gang, which does not require a CDL. Plaintiff argues the Helper position does in fact require a CDL, and the placement was merely a way to reduce his pay. However, Plaintiff does not present any evidence to support this argument. Plaintiff only points to Helper positions on different gangs as evidence of the CDL requirement. The Court is not persuaded by this argument.

[75] 42 U.S.C. § 12112(b)(6); *see also Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 (11th Cir. 2009) (per curiam).

[76] 42 U.S.C. § 12112(d)(4)(A).

both job-related and consistent with business necessity.[77]

First, as stated above, the FMCSR permits employers to enforce more stringent requirements relating to safety of operation and employee safety and health. Further, in implementing the National Registry of Medical Examiners, the FMCSA states,

> In addition, we believe that employers should continue to have the option to require their drivers to be examined by a ME selected and/or compensated by the employer, because they have an obligation to require drivers to comply with the regulations that apply to the driver.[78]

Because Defendant has the ultimate responsibility for ensuring compliance with driver medical standards and may incur liability and penalties if it permits unqualified individuals to drive, the Court finds Defendant's rule to require its employees to go to an approved medical facility is job-related and consistent with business necessity.

Second, where an employee can do "tremendous harm if they act irrationally," an employer is not required to "wait until a perceived threat becomes real or questionable behavior results in injuries."[79] Here, the Apprentice position Plaintiff held in September 2013 required him to engage in safety sensitive job functions, such as climbing bridges, working around train tracks, and using power equipment. When Plaintiff returned to work after his stroke, his coworkers notified the Project Manager that Plaintiff was

---

[77] Though the Court agrees Plaintiff's Complaint does not state an ADA claim based on his removal from services, out of an abundance of caution, it will still address Defendants affirmative defense to such a claim.

[78] Fed. Reg. Vol. 77, No. 77, p. 24108 (April 20, 2012) ("This option is permitted by 49 CFR 390.3(d), which states that nothing in the FMCSRs 'shall be construed to prohibit an employer form requiring and enforcing more stringent requirements relating to safety of operation and employee safety and health.'").

[79] *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) (requiring a police officer to complete a fitness for duty examination after colleagues were worried he might be paranoid).

demonstrating a troubling level of confusion.[80]  Based on these reports, Norfolk Southern removed him from service until he could be cleared by a neurologist.  Regardless of whether Plaintiff was actually exhibiting these behaviors, Norfolk Southern had a reasonable, objective concern about Plaintiff's medical health, which affected his job performance and threatened the safety of his coworkers.  Furthermore, as soon as Plaintiff was medically cleared, he returned to work.  Thus, the Court also concludes Norfolk Southern's decision to remove Plaintiff from service in September 2013 was job-related and consistent with business necessity.

Accordingly, the business-necessity defense affords Norfolk Southern a complete defense to Plaintiff's claims.[81]

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Doc. 22] is **GRANTED**.

---

[80] Specifically, it was reported that Plaintiff (1) lost "focus at times and could not remember information from job briefings;" (2) "would forget what he was supposed to do once the gang got to a job site;" (3) "had not recognized a work location, and in fact, had argued with a coworker about their location until he spent time looking around the area;"  and (4) "had put tools up in his truck, walked to another truck, and asked whether they wanted to put the tools up on the second truck. Jones Dec., [Doc. 30-3] at p. 3.

[81] *See Allmond*, 558 F.3d at 1317 ("Once an employer demonstrates that the pertinent qualification standard is job-related and consistent with business necessity, the burden shifts to the plaintiff to offer a reasonable accommodation that would allow him to satisfy that standard.").  As stated above, Plaintiff cannot point to a reasonable accommodation.

**SO ORDERED**, this 31st day of March, 2017.


S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT